UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CSC HOLDINGS, INC.,   Case No. 04 Civ. 5608 (ADS)(JO)

**AFFIDAVIT OF DONALD
KEMPTON IN SUPPORT OF
DAMAGES INQUEST**

Plaintiff,

- against -

WILLIAM GORMAN,

Defendant.
------------------------------------------------------------X

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NASSAU    )

**DONALD KEMPTON**, being duly sworn, deposes and says:

1. I am the Manager of Investigations for plaintiff, CSC Holdings, Inc. ( "Cablevision" or "plaintiff"). I submit this affidavit in Support of Cablevision's application for damages and reasonable attorneys' fees against defendant William Gorman ("Gorman" or "defendant"), against whom a default judgment has been entered. I have personal knowledge of the following facts and, if called as a witness, could and would testify competently to the same.

**Cablevision and its Systems**

2. Cablevision is a cable television operator which has been awarded franchises by Suffolk County which authorize it to construct, operate and maintain cable television systems in parts of Suffolk, including those parts of Suffolk County in which defendant resided at all relevant times. Cablevision offers cable television programming services to customers who request and agree to pay for them.

3. Cablevision's programming is offered to residential and commercial customers and consists of different tiers of programming service. In addition to tiers of service such as "Basic" (mostly broadcast programming) and "Family" (Basic programming plus some non-broadcast programming such as ESPN and A&E), Cablevision also offers to its customers "premium" programming (such as The Movie Channel, Showtime and Cinemax) and "pay-per-view" programming (special sporting events, concerts and recently released movies offered on a "per event" basis).

4. For Cablevision's residential customers, the Basic tier of service costs approximately $13.00 per month and the Family tier costs approximately $35.00 per month. Individual premium services range in price from approximately $1.95 to $14.95 per month. The full range of Cablevision's premium services, not including pay-per-view events, is offered at an approximate cost to residential customers of $80.00 per month. That figure includes the price for Cablevision's Family and Basic tiers of service, which must be ordered to receive premium services. The exact prices for Cablevision's cable television services change periodically and vary slightly from system to system.

5. The pay-per-view events that Cablevision offers to its residential customers typically range in price between approximately $3.95 and $54.95 per selection and most are offered continuously on several channels, twenty-four hours per day. The aggregate value of all pay-per-view events offered over a typical month, over a typical system, assuming each pay-per-view event is viewed only once, is approximately four hundred dollars.

6. Cablevision provides its cable television services to its customers via subscription agreements, pursuant to which Cablevision agrees to provide the programming

services requested by a customer in return for the customer's agreement to pay for the same on a monthly basis.

7. Cablevision's customers pay a monthly fee for the specific level and amount of programming services they have selected and agreed to purchase from Cablevision. Each Cablevision customer is entitled to receive only the level and amount of cable programming services that such customer has specifically selected and agreed to purchase.

8. Cablevision's customers who elect to receive more than its Basic programming package (and "Basic" customers who intend to view pay-per-view services) are offered a piece of equipment known as a converter-decoder, which Cablevision programs so that such customers can receive and view only the specific level and amount of cable programming that they selected, agreed to purchase, and are thereby authorized to receive. The rental fee for the converter-decoders Cablevision provides to its customers is regulated by the Federal Communications Commission on an actual cost basis and is included on customers' monthly bills.

9. Cablevision receives the signals to some of its cable television programming services, including all premium and pay-per-view programming, in over-the-air transmissions from orbiting satellites and local radio towers. In order to protect its cable programming from theft and unauthorized reception, Cablevision encrypts or "scrambles" the signals to all but one of its premium programming services and all of its pay-per-view programming services. When Cablevision's programming is in a scrambled mode, it is distorted and unviewable to a customer who has not agreed to pay for such programming.

10. Cablevision separately authorizes, by computer command, each of the converter-decoders it provides to its customers so that each such device descrambles only those

3

scrambled programming services that such customer possessing the device has selected and agreed to purchase.

11. The converter-decoders that Cablevision provides to its customers have the technology feature and function known as "addressability." Addressability is a communication link between Cablevision's central computer and the descrambling and computer circuitry in the converter-decoders provided to Cablevision's customers.

12. Addressability enables Cablevision to send signal commands to each addressable converter-decoder attached to a Cablevision system in order to direct it to descramble the particular programming that each customer has selected and agreed to purchase. For example, addressability enables Cablevision to upgrade or downgrade its customers' authorized levels of service without having to mechanically alter or physically replace the converter-decoder in a service call to a customer's home or business.

13. Scrambling is a principal security measure used by Cablevision and other cable operators to protect their programming services from unauthorized reception. Theft of cable television programming is commonly known as cable "piracy" and, on a national scale, causes annual revenue losses to the cable industry of approximately $5.1 billion, exclusive of the theft of pay-per-view services.

14. There is a "black market" industry of various manufacturers, vendors, and distributors of "pirate" cable television converter-decoders and other illicit descrambling equipment. Individuals purchase "pirate" converter-decoders from such vendors and then use them, instead of legitimate converter-decoders, in their homes and/or businesses to gain unauthorized access to cable operators' scrambled premium and pay-per-view programming services. Individuals also purchase other descrambling devices from such "pirate" equipment

4

vendors, including devices known as "cubes," "pancakes" and "chips." Chips, which are actually programmed integrated circuits, are inserted into legitimate converter-decoders in order to modify such legitimate devices into "pirate" devices. Cubes and pancakes are external devices that are attached to legitimate converter-decoders. Once attached properly, they intercept the legitimate computer commands sent by the cable operator and "ground" them. They then instantaneously "spoof" the legitimate computer commands such that the "spoofed" commands instruct the converter-decoder to descramble all scrambled programming.

15. "Pirate" converter-decoders and other illicit decoding devices, in any form, enable their users to receive and view all scrambled premium and pay-per-view programming in a descrambled mode without payment or authorization. "Pirate" converter-decoders, and legitimate converter-decoders affected by components such as chips, cubes and pancakes, are not addressable, so cable operators such as Cablevision are unable to communicate with the devices in order to control which programming services are descrambled, or even recognize that such devices have been attached to the cable system.

### The Nature of Cablevision's Claims Against Defendant

16. Cablevision's claims against Gorman arose following an investigation of a business known as Explorer Electronics ("Explorer") of Dyer and Schererville, Indiana. Cablevision suspected that Explorer was engaged in the sale and distribution of "pirate" converter-decoder devices and other descrambling equipment.

17. Cablevision's investigator made undercover purchases of "pirate" converter-decoders from Explorer, and was advised by Explorer's representative that such devices would enable their users to receive all of Cablevision's scrambled premium and pay-per-view programming services without authorization. The devices Cablevision's investigator

purchased were subsequently tested and found to be non-addressable, and to descramble all encrypted premium and pay-per-view programming offered by Cablevision without authorization. Cablevision filed a civil action against Explorer in the Northern District of Indiana, Hammond Division. See CSC Holdings, Inc. v. Explorer Electronics, No. 2:03 CV 58 (N.D.Ind. Feb. 24, 2003) (Moody, J.).

18. As a result of Cablevision's investigation, the United States District Court for the Northern District of Indiana, Hammond Division, entered an Order that, inter alia, directed the United States Marshal Service to execute a civil seizure at the business premises of Explorer. At the seizure, many hundreds of "pirate" cable television descrambling devices were found and Explorer's business records were seized by the Assistant U.S. Marshals and delivered to Cablevision.

19. Cablevision then copied Explorer's computer database containing records of its sales and shipments of "pirate" descrambling equipment to purchasers across the United States. Cablevision thereafter determined whom, among persons and business entities in Cablevision's service areas, purchased "pirate" descrambling equipment from Explorer. The information ultimately obtained by Cablevision from Explorer's records includes the relevant transaction between Explorer and Gorman, in which defendant purchased "pirate" descrambling equipment that defeats the scrambling technology Cablevision employed on the system that provided service to Gorman's residence. Attached hereto as Exhibit "C" is the record evidencing this transaction.

### Cablevision's Request for an Award of Damages against Defendant

20. Defendant's residence is located at 23 Lafayette Drive , Shirley, New York 11967, became a Cablevision customer on November 27, 2000 receiving Cablevision's

Family level of service. The account is listed under the name William Gorman. To date, defendant's residence continues to receive Cablevision's Family level of cable television service.

21. On or about April 29, 2002, defendant purchased one (1) Global Universal Cable descrambling device from Explorer for $217.00 (including shipping and handling). A copy of the sale records reflecting defendant's purchase is attached hereto as Exhibit "C."

22. On many occasions in the course of my employment as the Manager of Investigations for Cablevision, I have seen the particular type of device purchased by defendant, and I am familiar with the operation and function of the Global Universal on a cable television system. The device defeats the encryption technology used by Cablevision in its Suffolk County, New York cable television system. When used on Cablevision's System the Global Universal device is non-addressable, descrambles and permits viewing of all of Cablevision's scrambled cable television programming services, including all but one of its premium services and all of its pay-per-view services.

23. As set forth above, there is no legitimate reason why Cablevision's customers would need to purchase cable television descrambling equipment from third-party vendors such as Explorer. Any customer who is authorized by Cablevision to receive any scrambled programming from Cablevision receives an authorized converter-decoder from Cablevision at a cost that, when amortized over the useful life of the device, is markedly less expensive than the cost of purchasing compatible "pirate" equipment.

24. Furthermore, there is no legitimate function or purpose on an addressable cable system for devices that have been designed to enable the descrambling of all scrambled cable programming, including pay-per-view events, without limitation. The sole purpose of such devices is to enable their users to receive, without authorization, scrambled cable television

7

programming services without having to pay for those services. As defendant would have been provided with an authorized converter-decoder from Cablevision that limited the defendant's reception to the programming services the defendant ordered and agreed to pay for, the only conceivable motive defendant could have had in purchasing descrambling equipment was to receive the scrambled premium and pay-per-view programming services from Cablevision without having to pay for them.

25. By using the "pirate" descrambling device that the defendant purchased from Explorer, defendant was able to receive all scrambled premium and pay-per-view programming services offered by Cablevision without having to pay for such services in violation of 47 U.S.C §§ 605(a) and 553(a)(1).

26. At the time of defendant's purchase, Cablevision offered several scrambled premium programming services to its residential customers, including The Disney Channel, Cinemax and The Movie Channel. These services were offered at an average monthly price of $11.95 each. As stated above, the price of subscribing to the Family tier of service plus all premium services totals approximately $80.00 per month to residential customers. As further stated above, the total cost for all pay-per-view events offered by Cablevision is many hundreds of dollars each month, which does not include the value of pay-per-view programming services viewed more than once.

27. The value of services stolen from Cablevision is not limited to the programming that the individual using the "pirate" device may actually view in a given month. Rather, the value of plaintiff's programming is based upon the amount of access the individual gains to such programming. When a legitimate customer orders a premium service or a certain pay-per-view event, that individual is purchasing <u>access</u> to that programming and must pay for

8

such programming regardless of whether or not the customer ultimately views it. For example, if a customer orders the Family tier of service and views a total of one half-hour of television that whole month, the customer is still required to pay the full amount for the Family tier of service. By obtaining unauthorized access to all of Cablevision's scrambled premium and pay-per-view programming, defendant was receiving all such programming without authorization and in violation of 47 U.S.C §§ 605 and 553.

28. Cablevision's agreements with its customers prohibit both the tampering with Cablevision's equipment and system, and the unauthorized reception of Cablevision's programming services.

29. The theft of Cablevision's cable television service not only causes direct monetary loss to Cablevision, but also adversely affects the County of Suffolk, which grants franchises to Cablevision for operation of its cable television systems there. The County of Suffolk receives and derives franchise fees based on Cablevision's gross revenues.

30. Cablevision residential customers also suffer from Cablevision's impaired ability to purchase and offer a high quality selection of programming services. Furthermore, maintaining unauthorized attachments to Cablevision's cable systems may result in signal degradation and signal leakage, which violates F.C.C. regulations and for which Cablevision may suffer substantial fines and other sanctions. I respectfully urge this Court to send a strong message to defendant herein and to those who would steal cable television services that such conduct is not and will not be tolerated.

31. In accordance with its statutory rights under 47 U.S.C. §§ 605 and 553, Cablevision hereby elects to recover money damages under section 605(e)(3)(C) against defendant for the defendant's violation of 47 U.S.C. §§ 605(a) in the form of statutory damages,

as opposed to actual damages. Defendant's default has prevented Cablevision from discovering evidence in support of how long defendant has been receiving Cablevision's programming services without authorization subsequent to defendant's purchase of "pirate" descrambling equipment. Cablevision therefore requests that it be awarded statutory damages pursuant to 47 U.S.C. §§ 605(e)(3)(C)(i) against defendant.

_____
DONALD KEMPTON

Sworn before me this
9 day of June 2005

_____
Notary Public

CATHERINE A. FLYNN
Notary Public, State of New York
No. 01FL6099857
Qualified in Nassau County
Commission Expires October 6, 2007

10