UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
CSC HOLDINGS, INC.,

                                Plaintiff,                    **REPORT AND**
                                                                         **RECOMMENDATION**
                - against -
                                                                         CV 04-5608 (ADS) (JO)

WILLIAM GORMAN,

                                Defendant.
-----------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

        Plaintiff CSC Holdings, Inc. ("Cablevision") seeks an award of damages against defendant William Gorman ("Gorman") for alleged violations of the Federal Communications Act of 1934, as amended, 47 U.S.C. §§ 553(a)(1) and 605(a) ("FCA"). *See* Docket Entry ("DE") 1 ("Complaint"). As a result of Gorman's failure to answer the Complaint, the Honorable Arthur D. Spatt, United States District Judge, granted Cablevision's motion for a default judgment and referred the matter to me for a Report and Recommendation as to the appropriate amount of damages, attorneys' fees, and costs that Cablevision should recover. DE 8. I now make that report and, as explained below, recommend that the court enter judgment in favor of Cablevision in the amount of **$1,506.00**.

I.       Background

      A.      Procedural History

        Cablevision filed its Complaint on December 22, 2004, and served it on Gorman nearly six weeks later on February 1, 2005. DE 1; DE 2. Nine weeks later, Gorman had not yet responded to the complaint, and Cablevision therefore filed a motion for a default judgment. DE 4. The Clerk noted Gorman's default on April 12, 2005. DE 6. Judge Spatt granted the motion

on April 18, 2005, and made the instant referral to me for an inquest as to damages and other appropriate relief.  DE 8.  Cablevision filed its moving papers and supporting affidavits on June 20, 2005.  *See* DE 9 (Memorandum of Law) ("Memo."); DE 10 (Affidavit of Donald Kempton In Support Of Damages Inquest) ("Kempton Aff."); DE 11 (Affirmation [of Melinda M. Dus] Of Services In Support Of Inquest) ("Dus Aff.").

      B.      <u>Facts</u>

The following facts are drawn from Cablevision's complaint, the allegations of which I deem established in light of Gorman's failure to answer.  Cablevision operates franchises under which they have the right to construct, operate, and maintain cable television systems within parts of Suffolk and Nassau Counties.  Complaint ¶ 6.  Cablevision provides programming to its subscribers in the form of two packages, "Basic" and "Standard," for which subscribers pay on a monthly basis.  *Id.* ¶ 7.  Subscribers can also purchase "premium" programming (such as the Cinemax, Home Box Office, and Showtime movie channels) for an additional monthly charge added to the cost of their base package.  *Id.*  Additionally, Cablevision offers subscribers "pay-per-view programming" allowing them to purchase one-time access to individual movies or other special programs.  *Id.* ¶ 8.  Cablevision's transmissions are encrypted to prevent unauthorized viewing.  Customers wishing to view Cablevision broadcasts must establish a subscription and obtain a converter that de-scrambles the transmission.  Cablevision's system is "addressable," meaning that each converter is programmed by a central computer that will de-scramble only the programs that a customer has purchased (or for which the customer has agreed to be billed), leaving all other transmissions encrypted.  *Id.* ¶ 12.

Cablevision came to suspect that a business known as Explorer Electronics ("Explorer") was engaged in the sale and distribution of "pirate" converters, and set out to investigate whether its suspicion was well-founded. Kempton Aff. ¶ 16. After successfully purchasing and testing Explorer's product, Cablevision determined that it allowed the user to de-scramble Cablevision's analog premium and pay-per-view transmissions and to view all such programming without authorization. *Id*. ¶ 17. As a result of the investigation, and at the direction of the United States District Court for the Northern District of Indiana, the United States Marshals Service executed a civil seizure warrant at Explorer's business premises, seizing "pirate" converters as well as a database containing a record of its sales. *Id*. ¶¶ 18-19.

The sales records seized from Explorer contained documentation indicating that on April 29, 2002, Gorman purchased one "Global Universal" converter for $197.00 that is capable of de-scrambling the premium and pay-per-view analog signals generated by Cablevision's Nassau County System. *See* Dus Aff., Ex. C. Cablevision asserts that Gorman, armed with the "pirate" device, intercepted, received, and decrypted Cablevision's analog transmissions of television programming without authorization, or assisted others in doing so. Complaint ¶ 1.

II.  Discussion

    A.  No Hearing Is Needed

Upon the entry of default, a party concedes all well pleaded factual allegations except those relating to damages. *See* Fed. R. Civ. P. 8(d); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) (citations omitted). A plaintiff must prove its damages if they are neither "susceptible of mathematical computation" nor liquidated as of the default. *Id*. (citations omitted); *see* Fed. R. Civ. P. 55(d)(2). To determine the appropriate

amount of damages, courts have "the discretion to rely on detailed affidavits or documentary evidence in lieu of an evidentiary hearing." *DirecTV, Inc. v. Perrier*, 2004 WL 941641, *2 (W.D.N.Y. March 15, 2004) (citations omitted). "A hearing is not required as long as the court ensures that there is a basis for the damages awarded." *Id.* Because Cablevision has submitted a sufficient declaration and memorandum in support of its motion, I have not required it to appear at a hearing.

  B. <u>Damages</u>

The FCA generally prohibits the unauthorized transmission or reception of interstate or foreign radio or wire communications. 47 U.S.C. § 605(a). It permits aggrieved persons to sue those who violate the statute. 47 U.S.C. § 605(e)(3). An "aggrieved person" includes wholesale or retail distributors of cable programming. *Id*. § 605(d)(6). A party may elect to recover either actual damages or an amount in a statutorily defined range. *Id*. § 605(e)(3)(C)(i).

The court may award such damages in any amount between $1,000 and $10,000, as it considers just, and in determining the specific amount within that range should consider the market value of the rights infringed, the revenue lost by the plaintiff, the infringer's state of mind, and deterrence of future infringement. 47 U.S.C. § 605(e)(3)(C)(i)(II); *see Kingvision Pay-Per-View Ltd. v. Olivares*, 2004 WL 744226, *3 (S.D.N.Y. April 5, 2004) (citations omitted).

Cablevision claims that Gorman's default precluded the discovery of evidence necessary to determine actual damages based on the duration and extent of his actual unauthorized receipt of Cablevision services subsequent to the purchase of the pirate converter in April 2002. Memo at 6-7. Accordingly, it does not estimate its actual damages, but it does claim that an award of the maximum statutory damages ($10,000) is reasonable in light of the value of the services to

4

which Gorman had access for the more than two years that lapsed between the date he purchased the device and the date Cablevision filed its Complaint in the instant matter. *Id.* Cablevision thus appears to argue that the value of the damages it suffered should be measured as the value of services to which Gorman had access. Kempton Aff. ¶ 27. Cablevision states that during the time Gorman possessed the unlawful de-scrambler he was also a lawful cable subscriber paying approximately $35 per month. *Id*. ¶ 20. Using the device would give the user access to programming for which Cablevision normally charges approximately $80 per month as well as to pay-per-view programming for which it could charge approximately $400 per month. *Id*. ¶¶ 5, 26. I can infer that Cablevision would thus have me calculate its actual damages as the difference between the $35 per month that Gorman paid for his authorized access to programming and the roughly $480 worth of programming to which he had access each month – *i.e*., $445. For the 28-month period in question actual damages calculated under such an approach would total $12,460. In further support of its claim for maximum statutory damages, Cablevision notes that Gorman willfully violated the law, and that such an award is necessary to deter would-be cable thieves. Memo. at 6-7.

  I disagree with Cablevision's reasoning and therefore conclude that there is not good cause to award Cablevision the statutory maximum. I begin my analysis by noting that there is no evidence either as to Gorman's state of mind or as to any profit he may have realized by violating the FCA. On similar facts, other courts have awarded damages in the amount of $1,000 per violation, reasoning that this minimum amount is sufficient to deter future violations. *See e.g. Perrier*, 2004 WL 941641, at *3.

5

I therefore look to the record for evidence of Gorman's actual usage of the device to support the proposition that he in fact gained something of value from his prohibited conduct. In this regard, I distinguish between premium and pay-per-view programming. As noted above, a subscriber pays a monthly fee for unlimited access to the former, regardless of how much she watches or indeed if she watches none at all; but with respect to pay-per-view programming, Cablevision charges only for specific programs that the subscriber affirmatively selects. That difference in payment schemes requires a differentiated approach to damages.

With respect to pay-per-view, the record indicates no more than that Gorman possessed a device that enabled him to gain unauthorized access to any and all programs during a 28-month period. I note that for Cablevision to have sustained actual damages in excess of the $10,000 statutory maximum over the relevant period, Gorman would have had to access an average of $312 worth of pay-per-view programming each month.[1] In the absence of any evidence of Gorman's actual use of the device, I see no reason to assume that Gorman made (or allowed someone else to make) the maximum or near-maximum possible use of that access.

But while the record does not establish that Gorman used his de-scrambler to watch any pay-per-view, it does establish that possessing the device improperly put him in a position identical to paying customers who likewise might or might not have taken advantage of their unlimited access to programming on "premium" channels. An award that costs Gorman less than the amount such customers would have paid for similar access might encourage others to emulate

---

[1] This figure was derived as follows: $10,000 divided by 28 months is $357 per month. Of that $357, $45 is accounted for by the difference between the non-pay-per-view services that Gorman paid for ($35) and those to which he had access ($80). Kempton Aff. ¶¶ 20,26. The remaining $312 per month in damages is presumably based on the pay-per-view services to which Gorman had access.

Gorman's misconduct, since it would signal that the cost of getting caught violating the FCA might be no more than the cost of subscription fees.

If deterring the Gormans of the world from using pirate access devices was the only interest at stake here, my analysis would go no farther and I would recommend an award of damages somewhat higher than the minimum amount endorsed in *Perrier*, although still considerably less than the maximum Cablevision seeks. But there is another category of conduct that should also be deterred. This case is only the latest in a long string of lawsuits in this district in which this plaintiff (or its corporate predecessors), represented by the same law firm, has advanced a similar theory to seek the statutory maximum, only to have the district court analyze and reject its analysis. *See CSC Holdings, Inc., v. Marc Martin*, CV 05-0384 (NGG) (JO), DE 8 (E.D.N.Y. Feb. 22, 2006) (citing cases).[2] Cablevision has unsuccessfully advanced a theory based on an assumption that the defendant watched the maximum amount of pay-per-view programming available in at least seven cases. *See id.* Notably, in other cases, Cablevision either explicitly or implicitly acknowledged that it was unlikely that the defendant actually watched so much pay-per-view programming, and therefore requested a lower amount. *See CSC Holdings, Inc. v. Bell*, CV 04-5603 (TCP) (ARL), DE 7-2 at 7-8 (E.D.N.Y. Jun. 28, 2005) (seeking $50 per month in pay-per-view damages) (citing *CSC Holdings Inc. v. Galasso*, CV 03-780 (DRH) (ARL), DE 7 at 7 (E.D.N.Y. Oct. 26, 2004) (recommending $50 per month for damages resulting from unlawful reception of pay-per-view programming)); *CSC Holdings, Inc. v. Cella*, CV 04-5690 (DRH) (ARL), DE 6 at 7-8 (E.D.N.Y. Sep. 26, 2005) (same); *CSC*

---

[2] My analysis in this case is substantively similar to, and indeed a nearly verbatim replication of, that set forth in my report and recommendation to Judge Garaufis in *Martin*. That report and recommendation remains under review.

*Holdings, Inc. v. Jones*, CV 05-1130 (JS) (WDW), DE 7 at 7 (E.D.N.Y. Jul. 21, 2005) (seeking $50 per month in pay-per-view damages) (citing *CSC Holdings Inc. v. Delvalle*, CV 03-5870 (TCP) (WDW), DE 10 at 7 (E.D.N.Y. Jul. 19, 2004) (recommending $50 per month for damages resulting from unlawful reception of pay-per-view programming)); *CSC Holdings, Inc. v. Schock*, CV 05-1131 (TCP) (ETB), DE 10-1 at 3-4 & n.3 (E.D.N.Y. Aug. 2, 2005) (seeking $75 per month in pay-per-view damages).

Unfortunately, after its brief flirtation with a more realistic assessment of both actual damages and the case law, Cablevision has now resurrected in this case the theory that it should be given the benefit of the assumption that a defaulting defendant actually used a pirate device to watch a very substantial amount of pay-per-view programming every month that he could do so. Why is Gorman more likely than earlier defaulting defendants Bell and Cella to have watched so much? Why has Cablevision abandoned the wisdom it learned, however fleetingly, from the decisions in *Galasso* and *Delvalle*? The record provides no clue.

Unless and until Cablevision pays some price for its apparent unwillingness to accept the consistent rulings of the various judges of this court, it will have no disincentive to continue making its patently unrealistic claims or damage and imposing needless burdens on the court. Accordingly, I respectfully recommend that the court exercise its discretion to award Cablevision the minimum amount of $1,000 in statutory damages.

    C.    <u>Attorneys' Fees and Costs</u>

The FCA permits the recovery of reasonable attorneys' fees and costs. *See* 47 U.S.C. § 605(e)(3)(B)(iii). A request for attorneys' fees must be supported by "contemporaneous time records that show 'for each attorney, the date, the hours expended, and the nature of the work

done.'" *DirectTV v. Meinecke*, 2004 WL 1535578, at *4. (S.D.N.Y. July 9, 2004) (citing *New York Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983)). In support of its request for attorneys' fees in the amount of $1,419.00 and costs in the amount of $187.00, Cablevision submitted a declaration from counsel that includes as an exhibit counsel's contemporaneous records. *See* Dus Aff. ¶¶ 7-9.

Cablevision and its counsel have agreed among themselves that the attorneys will bill for certain activities by task rather than by the amount of time the attorneys actually spend performing such tasks. Specifically, they have agreed that the attorneys will charge Cablevision $300 for drafting the complaint, $200 for litigating the motion for a default judgment, and $600 for litigating the instant damages matter. *See id*. ¶ 6. In billing for such tasks, the attorneys indicate on their bill that zero hours were spent performing the work. The attorneys charge an hourly rate for other tasks related to the litigation.

In addition to explaining its task-based billing arrangement, counsel has provided the relevant hourly billing rate for the attorneys who perform such tasks, which allows me to make a rough comparison of this flat rate billing scheme and the time that would have been needed to accomplish each relevant task if counsel were to seek similar remuneration under an hourly billing scheme. Attorney Melinda M. Dus was responsible for drafting the complaint and the default submission. Judging by her hourly billable rate of $165, she would have me believe that these tasks were worth nearly three hours of her time (in addition to 0.90 hours spent on related tasks, for which Cablevision seeks an additional $148.50). *See id*. ¶ 7. Attorney Michael G. McAlvin was responsible for drafting the damages submission. *Id*. ¶ 8. Comparing his billable rate of $165 with the flat rate charged to Cablevision suggests that his work on this task has a

value equivalent to three and two-thirds hours of his time (in addition to 0.40 hours spent on related tasks, for which Cablevision seeks $66 beyond the flat fees). *Id*. Cablevision also seeks $104.50 for the 1.1 hours that paralegal Susan A. Weindler billed for tasks associated with filing the Complaint and affidavit of service. *See id.* ¶ 9; Ex. F. Finally, Cablevision requests $37 for costs relating to serving defendant with the summons and complaint and $150 for the filing fee. *See id*. ¶ 10.

If the papers served in this case were in any meaningful sense the product of original legal work, Cablevision would likely be in a position to satisfy the requirement of providing detailed work records set forth in *Carey* and similar cases. Its failure to do so is sufficient reason to deny its request to be reimbursed for the flat-fee tasks. *See*, *e.g.*, *Cablevision Systems New York City Corp. v. Diaz*, 2002 WL 31045855, *5 (S.D.N.Y. Jul. 10, 2002) ("Whatever the reasonableness of these sums may be, the request for them fails to comply with the requirements of *Carey* and, therefore, must be denied.) (citing *Pay-Per-View v. Jasper Grocery*, 152 F. Supp.2d 438, 443 (S.D.N.Y. 2001); *Kingvision Pay-Per-View v. The Body Shop*, 2002 WL 393091, at *5 (S.D.N.Y. Mar. 13, 2002)).

The fact that Cablevision is not in a position to meet its burden is symptomatic of a more troubling aspect of its application. As a laborious review of past cases reveals, Cablevision's submissions in this case are cookie-cutter replications of papers the same party, acting through the same law firm, has submitted time and again. *See*, *e.g.*, *CSC Holdings, Inc. v. Malcom*, CV 03-0101 (ADS) (ARL), DE 1 (E.D.N.Y. Jan. 8, 2003) (Complaint; virtually identical to the one in this case); *CSC Holdings, Inc., CSC Holdings, Inc. v. Siciliano*, CV 04-1908 (LDW) (MLO), DE 1 (E.D.N.Y. May 7, 2004) (same); *CSC Holdings, Inc. v. Hughes*, CV 05-1125 (ADS) (JO),

DE 1 (E.D.N.Y. Feb. 28, 2005) (same); *CSC Holdings, Inc. v. O'Donnell*, CV 03-5865 (DRH) (ARL), DE 7 (E.D.N.Y. Mar. 30, 2004) (memorandum in support of damages; virtually identical to that submitted in this case); *CSC Holdings, Inc. v. Olivo*, CV 04-5435 (JS) (ARL), DE 9 (E.D.N.Y. May 27, 2005) (same); *CSC Holdings, Inc. v. Schock*, CV 05-1131 (TCP) (ETB), DE 10 (E.D.N.Y. Aug. 2, 2005) (same).

Indeed, while the individual attorneys who claim to have drafted the papers in this case may actually have done so, any congruence between counsel's affirmation to that effect and the truth appears to be a matter of mere coincidence.  In the *Martin* case cited above, Ms. Dus affirmed under penalty of perjury that the author of the complaint (an essentially verbatim copy of which she claims to have authored herself in this case) was a colleague named William E. Primavera.  *Compare* Dus Aff. ¶ 7 *with Martin*, DE 7 ¶ 6.  Likewise, in this case she affirms that the default submission and damages submission were drafted by, respectively, herself and attorney McAlvin, but in the *Martin* case she affirmed that essentially verbatim copies of those submissions were "drafted" by a paralegal assistant.  *Compare* Dus Aff. ¶¶ 7-8 *with Martin*, DE 7 ¶ 7.  Requiring a defaulting defendant to reimburse the company for the fees associated with "drafting" such boilerplate submissions – regardless of who can accurately claim to be their true author – would be unjust.

The flat fee compensation system that Cablevision and its counsel have created appears to allow the company to obtain legal services in this type of litigation essentially for free and to allow the law firm to make such cases a profit center.  That is because they submit the same boilerplate papers in case after case but seek reimbursement as if the papers had been drafted specifically for the instant case.  Such a system works to the great advantage of these two actors

11

because it shifts burdens (including the illusory burden of "drafting" boilerplate papers) to defaulting defendants.  By virtue of the fee-shifting provision and the way Cablevision and their counsel have acted, defaulting defendants end up paying over a thousand dollars apiece for "legal work" that represents little if anything more than inserting the next name, relevant dates, and the facts relating to how Cablevision obtained the database of pirate box purchasers into pre-existing pleadings and motion papers.

     New York's rules governing the ethical practice of law would seem to forbid such practices.  Specifically, the Disciplinary Rules of the New York Code of Professional Responsibility § 1200.11(a) state that "[a] lawyer shall not enter into an agreement for, charge or collect an illegal or excessive fee."  N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.11(a); *see also* N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.11(b) (defining excessive fees as those "in excess of a reasonable fee").  The lawyers representing Cablevision have entered into an agreement for, routinely charge, and now seek to collect an amount corresponding to approximately 9 hours of work for tasks that cannot remotely have taken that long to perform.  Such a billing scheme seems far from reasonable.  Moreover, it seems clear that Cablevision does not bear the brunt of this unreasonable system:  of the three tasks it has agreed to pay for at a flat rate – the complaint, a default motion, and a damages submission – two (billed at a total of $800) are of a type that are only likely to be paid by a defaulting defendant.  By shifting such fees to absent defendants, Cablevision has no incentive to insist that the law firm charge a reasonable fee for its minimal work in litigating these default cases.

     The court, in contrast, does have such an incentive:  specifically, its interest in maintaining public confidence in the integrity and fairness of its proceedings.  I therefore

respectfully recommend that this court get out of the business of facilitating a practice by Cablevision and its outside counsel that appears vastly to overstate the "reasonable" value of the legal services for which the movant seeks reimbursement. Whatever work any attorneys once did to generate the pleadings and motion papers Cablevision routinely uses in this type of litigation has long since been compensated, likely many times over. The incremental work needed to tailor those papers to the facts of this case is not legal work in any reasonable sense of the term, and should not be compensated as such. I therefore recommend that the court disregard Cablevision's request for fees to the extent it seeks reimbursement for the submission of boilerplate papers, and instead award only the $319 in legal and paralegal fees for work that Cablevision's attorney asserts was done specifically for this litigation. *See* Dus. Aff. ¶¶ 7-9 & Exs. D-F (contemporaneous time records).

III.     Recommendation

For the reasons set forth above, I respectfully recommend that the Court enter judgment awarding plaintiff Cablevision a total of **$1,506.00**, consisting of the following components:

**$1,000.00** in statutory damages under the FCA;

**$319.00** in attorneys' fees; and

**$187.00** in costs.

IV.     Objections

This Report and Recommendation will be electronically filed on the court's ECF system. Counsel for plaintiff Cablevision is directed to serve a copy of this Report and Recommendation on defendant Gorman and to file proof of service with the court.  Any objection to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to me within 10 days of service.  Failure to file objections within this period waives the right to appeal the District Court's Order.  *See* 28 U.S.C.  636 (b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Central Islip, New York
March 1, 2006

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge