UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
CSC HOLDINGS, INC.,                                   CV 04-5608 (ADS) (AKT)

                          Plaintiff,

- against -
                                                      **PLAINTIFF'S OBJECTIONS**
                                                      **TO REPORT AND**
WILLIAM GORMAN,                                       **RECOMMENDATION**

                          Defendant.
-----------------------------------------------------X

        Plaintiff CSC Holdings, Inc. ("Cablevision" or "Plaintiff"), by its attorneys, Lefkowitz,

Louis, Sullivan & Hogan, L.L.P., hereby respectfully submits its objections to the Report and

Recommendation ("R&R") entered in the above-captioned action on March 1, 2006, by United

States Magistrate Judge James Orenstein. A copy of the R&R is attached to the Affirmation of

Wayne R. Louis in Support of Cablevision's Objection ("Louis Aff.").

        Most significantly, in the R&R, the Court only awarded Cablevision the minimum amount of

statutory damages available under 47 U.S.C. § 605 and refused to award Cablevision reimbursement

for attorneys' fees relating to certain task-based billing activities. Cablevision respectfully submits

that the Court should not adopt the R&R and should instead award Cablevision statutory damages

and attorneys' fees consistent with 47 U.S.C. § 605 and its prior practices. Indeed, in addressing the

exact issues that are before this Court concerning a nearly identical report and recommendation,

Judge Garaufis in CSC Holdings, Inc. v. Marc Martin, 05 CV 0384 (NGG), found that Magistrate

Judge Orenstein erred when he only awarded Cablevision the minimum amount of statutory damages

available under 47 U.S.C. § 605. And, based upon Cablevision's explanation of the work done

relating to a task-based billing activity (drafting a Complaint), Judge Garaufis found that Cablevision

is entitled to reimbursement of its attorneys' fees relating to that task-based activity. Simply put, Cablevision respectfully submits that this Court should follow Judge Garaufis's Memorandum and Order in Martin, and, as explained in more detail below, award Cablevision statutory damages in the amount of $2,660.00 and costs and attorneys' fees in the amount of $1,606.00.

## **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

### **The Commencement of the Present Action**

Cablevision commenced the instant action alleging that defendant William Gorman ("Gorman" or "Defendant") violated 47 U.S.C. §§ 605 and 553 by using a "pirate" descrambling device purchased from a distributor of such equipment. Cablevision alleged that Gorman used the device to obtain cable television services over and above the level of services for which he agreed to pay Cablevision. After Gorman defaulted, Cablevision moved for a default judgment. By order dated April 18, 2005, the motion was granted and the matter was referred to Magistrate Judge Orenstein to report and recommend with respect to damages and attorneys' fees. Docket Entry ("DE") 8 at 2.

On June 20, 2005, Cablevision submitted its representative's affidavit discussing Cablevision's position with respect to damages suffered by defendant's use of a device, together with a memorandum of law supporting its position, and an attorney's affidavit delineating its attorneys' fees. DE 9-11. Gorman did not file any opposition.

### **The Report and Recommendation**

On March 1, 2006, Magistrate Judge Orenstein entered his Report and Recommendation ("R&R"). DE 12. Despite the facts that (i) this case was relatively similar to other cases ruled on for many years by district judges and magistrates in this and other federal courts, which resulted in

2

relatively consistent awards of damages and attorneys' fees; (ii) the defendant filed no opposition; and (iii) the Court held no hearing and requested no briefing on the issues addressed in the R&R, many of which fell beyond the scope of Cablevision's inquest submissions, the R&R reached much different results than prior decisions via a much different analysis. It recommended the minimum damages award available under § 605, and only a token award of Cablevision's attorneys' fees.

### The Report and Recommendation in CSC Holdings, Inc. v. Marc Martin, Cablevision's Objection, and the District Judge's Order Adopting the R&R in Part and Rejecting it in Part

On February 22, 2006, Magistrate Judge Orenstein entered a Report and Recommendation in CSC Holdings, Inc. v. Marc Martin, No. 05-CV-0384 (NGG)(JO), another relatively similar Communications Act case brought by Cablevision against a defendant who defaulted (the "Martin R&R"). The Martin R&R, a copy of which is attached as Exhibit "B" to the Louis Affirmation, is nearly identical to the R&R herein. Similar to the R&R, the Martin R&R recommended an award of the statutory minimum of $1,000 in statutory damages to Cablevision, and further recommended only a token award of attorneys' fees. Cablevision objected to the Martin R&R, and the Court (Garaufis, D.J.) issued a Memorandum & Order dated March 27, 2006 ("Martin M&O") adopting the R&R in part and rejecting it in part. A copy is attached to the Louis Aff. as Exhibit "C." In brief, the Martin M&O modified the Martin R&R to award $2,400.00 in statutory damages and increased the attorneys' fees and costs award to $817.00.

On March 29, 2006, Magistrate Judge Orenstein entered a Supplement to Report and Recommendation ("Supplement" or "Supp.") in this action (DE 17) and in CSC Holdings, Inc. v. Bokee, No. CV-04-5434 (ADS)(JO) (DE 17), another action in which he had issued a Report and Recommendation virtually identical to that issued herein. A copy of the Supplement is attached to

3

the Louis Aff. as Exhibit "D." The Supplement notes the entry of the Martin M&O and reiterates a point made in the R&R regarding the attorneys' fees issue.

As of March 31, 2006, both this case and Bokee were reassigned to newly-appointed U.S. Magistrate Judge A. Kathleen Tomlinson.

## ARGUMENT

Cablevision respectfully submits that the R&R is contrary to law in two fundamental respects. First, the R&R's award of minimal statutory damages of only $1,000.00 was contrary to law and unprecedented. The R&R explicitly recommended such limited damages not for any substantive reason, but in order to "deter" Cablevision from, and make it "pay some price" for, seeking the maximum amount of damages permitted by the statute. That is not a criterion that the law allows in assessing damages owed to a plaintiff, particularly when the amount requested is within the range provided for in the relevant statute.

Second, the Court's award of a total of $319.00 in legal fees, but none for the complaint, default judgment motion or inquest damages submissions, is contrary to law in that an award of reasonable attorneys' fees is *mandated* by 47 U.S.C. § 605 (e)(3)(B)(iii). The Court's primary stated justification for the reduced attorneys' fees award – that Cablevision's fixed-fee arrangement with its counsel improperly resulted in excess fees, and was intended to enable Cablevision to reap profits in cases brought against defaulting defendants – is based on assumptions that are simply false, and is unwarranted under the applicable law. Accordingly, Cablevision respectfully requests that the Court decline to adopt the R&R and instead award statutory damages and attorneys' fees consistent with 47 U.S.C. § 605 and the established precedents of this Court.

4

## I.     LEGAL STANDARD

Fed.R.Civ.P. 72 (b) provides for a district court's review of a magistrate judge's report and recommendation with respect to dispositive matters. Rule 72(b) provides that on a timely objection to a magistrate judge's report and recommendation, a district judge is required to "make a *de novo* determination . . . of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. Fed.R.Civ.P. 72(b); Silge v. Merz, No. 05 CV 3648, 2006 WL 39632, at *1 (S.D.N.Y. Jan. 6, 2006); State Farm Mut. Auto. Ins. Co. v. CPT Medical Servs., P.C., 375 F.Supp.2d 141, 155 n.7 (E.D.N.Y. 2005). The district judge may then accept, reject, or modify, in whole or in part, the findings or recommendation of the magistrate judge, receive further evidence, or recommit the matter to the magistrate judge with additional instructions. Fed.R.Civ.P. 72 (b); Silge, 2006 WL 39632, at *1. In addition to the existing record, the district judge in ruling pursuant to Fed.R.Civ.P. 72(b) may rely upon additional evidence when conducting its *de novo* review. Fed.R.Civ.P. 72(b); CPT Medical Servs., 375 F.Supp.2d at 158.

## II.    THE AWARD OF $1,000 IN STATUTORY DAMAGES WAS ERRONEOUS

In its memorandum of law in support of its motion for default damages, Cablevision explained that it sought damages based upon the estimated "benefit" to defendant from use of the pirate cable device between the date of its purchase and the date this case was filed. As Cablevision explained, awarding damages based upon this estimated benefit was consistent with how numerous courts addressing this issue have awarded damages to Cablevision. Cablevision then asserted that, since the estimated benefit to Gorman exceeded the statutory maximum of $10,000, it sought $10,000 in statutory damages. DE 7 at 6-7; DE 9 at 6-7 (affidavit of Donald Kempton of Cablevision describing defendant's paid-for level of service as contrasted with value of services receivable through use of pirate device).

5

Initially, the R&R apparently acknowledged, as Cablevision had argued, that a proper methodology for determining the amount of statutory damages to award was a methodology based upon the "benefit" to Gorman from his pirate decoder use. Thus, the R&R first analyzed the amount of pay-per-view programming that Gorman could obtain through his use of the device. However, the R&R never quantified the appropriate amount of damages for estimated pay-per-view use; it simply stated that Cablevision was not entitled to the maximum or near-maximum amount of pay-per-view damages. R&R at 6. The R&R then addressed the value of premium programming services that Gorman could obtain through use of the device. Significantly, the Court concluded that if it solely awarded Cablevision damages that were equal to the difference between the cost of all of Cablevision's premium programming and what defendant paid for Cablevision service, this would not be sufficient because, implicitly, this would fail to also take account of the reasonable value of pay-per-view programming:

> But while the record does not establish that Gorman used his de-scrambler to watch any pay-per-view, it does establish that possessing the device improperly put him in a position identical to paying customers who likewise might or might not have taken advantage of their unlimited access to programming on "premium" channels. An award that costs Gorman less than the amount such customers would have paid for similar access might encourage others to emulate Gorman's misconduct, since it would signal that the cost of getting caught violating the FCA might be no more than the cost of subscription fees.

R&R at 6-7. In this case, the difference between full premium programming and Gorman's Family Cable level of service was $45 per month. Over the 28 month time period between Gorman's purchase of the device and the date of the Complaint, this would be a "benefit" of $1,260 for premium programming alone. Most significantly, however, the R&R's award of $1,000 in damages was an amount that was <u>less than</u> the difference between the cost of all of Cablevision's premium programming and what defendant paid for Cablevision service, even though the Court acknowledged

6

that an award of damages equal to or less than this amount would not be sufficient. The R&R asserted that it was proper to award $1,000 in statutory damages in order to "deter" Cablevision's conduct, R&R at 7, and make it "pay[] some price." R&R at 8. Cablevision submits that for numerous reasons the R&R's assertion that it was proper to reduce Cablevision's damages award to "deter" or punish Cablevision was clearly erroneous.

First, the R&R's conclusion that Cablevision's requesting $10,000 in statutory damages is improper conduct, and thus needs to be deterred, is incorrect. See Martin M&O at 7 ("Cablevision asserts that Judge Orenstein's 'implied assumption' that its request for $10,000.00 in damages was improper and somehow warrants deterrence or punishment is erroneous as a matter of law. This court is inclined to agree."). As the R&R recognized, the statute upon which Cablevision's claims are premised, 47 U.S.C. § 605, clearly authorizes the award of statutory damages of up to $10,000. See R&R at 4; see also 47 U.S.C. § 605 (e)(3)(c)(i)(II). Thus, it is not surprising that courts have readily recognized that awarding Cablevision the maximum statutory amount (i.e., $10,000) in damages is completely proper. See, e.g., Cablevision Sys. New York City Corp. v. Torres, No. 02 Civ. 7602(AJP), 2003 WL 22078938, at n.6 (S.D.N.Y. Sept. 9, 2003) (explaining that awarding Cablevision the maximum of $10,000 in statutory damages is one of three methods that have been used by courts to calculate damages pursuant to 47 U.S.C. § 605); Cablevision Sys. New York City Corp. v. Flores, No. 00 Civ. 5935, 2001 WL 761085, at *4 (S.D.N.Y. July 6, 2001) (awarding Cablevision $10,000 in statutory damages). Accordingly, Cablevision respectfully submits that this Court should find, as in the Martin M&O, there was nothing improper in Cablevision's request for the statutorily-permitted amount of $10,000 in statutory damages, and that punishment or deterrence was unwarranted. Martin M&O at 7-9.

7

Second, even if Magistrate Judge Orenstein disagreed with Cablevision's request for $10,000 in statutory damages, the Court's recommendation that Cablevision be awarded only $1,000 in damages – the statutory minimum – as a means to punish and deter Cablevision was clearly contrary to law. Notably, the R&R, citing the Martin R&R, asserts that the Court found seven cases where Cablevision at the inquest stage requested $10,000 in statutory damages. R&R at 7. The R&R cites these cases as somehow supporting the position that Cablevision should be entitled to only $1,000 in statutory damages. Importantly, however, in *none* of the cases the R&R cited did the court determine that Cablevision was entitled to only $1,000 in damages. Rather, in all of the cases cited, the court rejected Cablevision's request for $10,000 and, instead, awarded Cablevision damages between $2,280 and $10,000 based upon the "benefit" to the specific defendant from the use of the device. Thus, the R&R is contrary to and unsupported by the very case law upon which it relies.

Third, the R&R misinterpreted the fact that in the past Cablevision had requested damages based upon estimated pay-per-view usage of only $50 or $75 per month, while in this matter Cablevision sought $400 per month in pay-per-view usage. The R&R, stating a need to punish and deter Cablevision, queries why Cablevision abandoned the "wisdom" of only requesting $50 or $75 in pay-per-view usage. R&R at 8. The reason why Cablevision requested only $50 or $75 for estimated pay-per-view usage in the cases cited in the R&R is simple. In all of the cases cited, the particular magistrate judge handling the matter had already ruled on the specific methodology that he or she would utilize to determine the amount of statutory damages. Thus, for example, when Cablevision requested only $50 per month for estimated pay-per-view damages in its inquest papers to Magistrate Judge Wall in CSC Holdings, Inc. v. Jones, cited in R&R at 7-8, Cablevision already had the benefit of his report and recommendation in CSC Holdings, Inc. v. Delvalle, cited in R&R at

8

8, wherein he recommended $50 per month in estimated pay-per-view damages.

Similarly, when the inquest was held in CSC Holdings, Inc. v. Schock, cited in R&R at 8, Cablevision already had the benefit of a prior ruling from Magistrate Judge Boyle wherein he awarded Cablevision $75 per month in estimated pay-per-view usage. When Cablevision submitted its inquest papers to Magistrate Judge Lindsay in CSC Holdings, Inc. v. Bell and CSC Holdings, Inc. v. Cella, cited in R&R at 7, Cablevision already had the benefit of her report and recommendation in CSC Holdings, Inc. v. Galasso, cited in R&R at 7, wherein she recommended $50 per month in estimated pay-per-view damages. Notably, in Galasso, Cablevision, based upon the methodology that Magistrate Judge Lindsay employed in a prior report and recommendation (in CSC Holdings, Inc. v. Heyamie, CV-01-3690 (CBA)(ARL) (E.D.N.Y. Sept. 16, 2002)), sought a flat amount of $4,000 in statutory damages that was not based upon the estimated benefit to the defendant. The prior ruling in Heyamie expressly rejected awarding damages based on access to programming services, id. at 7, n. 6 (granting a flat damages award of $4,000.00 and noting that "Plaintiff urges the Court to adopt the reasoning of cases such as Time Warner Cable v. Peluso, 00CV1539 (E.D.N.Y. Feb. 13, 2001) (Report and Recommendation), in which statutory damages are calculated based on the number of months of access to Plaintiff's programming. The Court respectfully declines to adopt this view."). However, in Galasso, Magistrate Judge Lindsay used a methodology that was based upon the benefit to the defendant, which included reference to the number of months of access to enhanced programming. Accordingly, in subsequent submissions to Magistrate Judge Lindsay, Cablevision modified its approach and followed the methodology that she used in Galasso.

In contrast, here, at the time Cablevision filed its inquest submissions, it had no report and recommendation from Magistrate Judge Orenstein upon which it could rely upon to determine the

specific methodology that he would use to calculate inquest damages. The Martin M&O credited Cablevision's explanation that, contrary to submissions made to other magistrate judges who had ruled upon such applications in the past, it had no insight into what methodology Magistrate Judge Orenstein would utilize to award damages, and thus Cablevision did not act improperly for requesting $400.00 in monthly pay-per-view damages and thus should not be punished for having done so. Martin M&O at 9.

It should also be noted that the methodology that various district judges and magistrates use to determine inquest damages varies widely. Besides the varying methodologies of the judges discussed above (awarding $50-$75 per month for lost pay-per-view revenues versus flat damages awards of up to $10,000), other judges have adopted still other approaches. See e.g., Time Warner Cable of New York City v. Barbosa, 2001 WL 118608, at *5 (S.D.N.Y. Jan. 2, 2001) (Ellis, M.J.) (estimating that monthly lost revenue was $150.00, including $90-$98 in pay-per-view events); Time Warner Cable of New York City v. Fland, 1999 WL 1489144, at *4 (S.D.N.Y. Dec. 3, 1999) (noting that other courts had used figures ranging from $80 to $125 per month for lost pay-per-view revenues, finding that the range was "somewhat low," because residences having access to free services would partake more, and determining that $225.00 per month would compensate the plaintiff and deter violators). Some courts have, for deterrence purposes, doubled the amount of estimated lost revenues to arrive at a statutory damages award. See e.g., CSC Holdings, Inc. v. Ruccolo, 2001 WL 1658237, at *3 (S.D.N.Y. Dec. 21, 2001) (Stein, J.) (doubling estimated value of stolen services to arrive at statutory damages award); Barbosa, 2001 WL 118608, at *6 (same). Given these varying approaches to damages, and the fact that Magistrate Judge Orenstein had not previously ruled in one of Cablevision's default cases at the time it filed its inquest submissions

herein, the R&R's implicit assumption that Cablevision disregarded the only reasonable method of calculating damages, thus meriting deterrence or punishment, is not borne out by the prior rulings of this Court or the Southern District.

Fourth, though the Court asserts that there is a need to deter Cablevision's conduct, R&R at 7, in general, courts will only exercise their discretion to deter conduct when there is a concern that the conduct at issue is widespread. For example, in United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979), the Second Circuit reversed dismissal of an indictment that had been dismissed to deter official misconduct. It found that the district judge had abused his discretion in dismissing the indictment absent any finding that the government's misconduct was "widespread or extraordinarily serious..."). Here, by the Court's own analysis undertaken in the Martin R&R, see Exhibit "B" at 6, the issue of the appropriate amount of inquest damages only arose in **12%** of the cases filed by Cablevision since 2003 (i.e., 20/164). In other words, in almost 90% of the cases filed by Cablevision, the matter was resolved without the need for an inquest. Moreover, out of this small percentage of cases, the court has pointed to only seven prior instances in which Cablevision sought the maximum amount of statutory damages (i.e., 4.2% of the cases) and, even including the three recent report and recommendations by Magistrate Judge Orenstein, based upon his own analysis, Cablevision's request for the maximum amount of statutory damages occurred in just ten cases out of the 164 cases filed by Cablevision. This is a percentage of just 6%. Cablevision respectfully submits that such a small number and such a small percentage of cases do not rise to the level of being "widespread" such that it would be proper for a court to reduce a damages award in a civil action to "deter" Cablevision's conduct even assuming arguendo the Court believed the requested damages award was excessive.

11

Finally, the one case cited by the R&R to support its recommendation of only $1,000 in damages is inapposite. See R&R at 4, 7 (citing DirecTV v. Perrier). In Perrier, the Western District of New York held that DirecTV would be entitled to $1,000 in inquest damages per device. That court based its holding upon other cases wherein DirecTV was awarded $1,000 in inquest damages per device. 2001 WL 941641, at *3. Here, however, as the cases cited in the R&R make clear, the most common methodology in this Court is to award statutory damages that are based upon the benefit to the defendant, not to simply award Cablevision $1,000.00.   Indeed, the R&R acknowledged that the Court would have granted Cablevision more than $1,000 as "endorsed in Perrier" had it not been for the desire to punish and deter Cablevision. See R&R at 7. Apart from the fact that, as discussed above, Cablevision has not acted improperly and thus does not need to be deterred or punished, the R&R's award of minimum statutory damages conflicts with its own conclusion that pirate decoder users should have damages assessed against them in excess of the benefits of free service obtained, because a smaller award "might encourage others to emulate Gorman's conduct, since it would signal that the cost of getting caught violating the FCA might be no more than the cost of subscription fees." Id. at 6-7.

The Martin M&O increased the award of statutory damages awarded in that case to $2,400.00. With respect to premium service, it relied upon the Martin R&R's conclusion that premium cable usage damaged Cablevision in the amount of $30.00 per month for 30 months for a total of $900.00. Martin M&O at 5, 10. It then determined that an assumption that Martin viewed pay-per-view services with a value of $50.00 each month, for a total pay-per-view damages figure of $1,500.00 over thirty months, was appropriate. Adding the $900.00 in premium service lost revenues to the $1,500.00 from lost pay-per-view revenues resulted in the $2,400.00 statutory

damages award.

Cablevision respectfully requests that the Court do precisely the same here. Using the 28 month period elapsing from Gorman's purchase of the device to the date that Cablevision filed the complaint herein, and multiplying it by $45.00 in monthly lost premium cable services (this amount of lost premium service revenues differs from that in Martin because Martin purchased a higher level of cable service and thus received fewer premium services for free), the lost revenues from premium services amount to $1,260.00. Adding $50.00 per month in lost pay-per-view revenues for 28 months results in a total of $1,400. Adding both figures together results in a total damages statutory damages award of $2,660.00. Cablevision requests an award of this amount in statutory damages.

## III. THE AWARD OF $319.00 IN ATTORNEYS' FEES WAS CONTRARY TO LAW

As noted in the R&R at 8, section 605 permits the recovery of reasonable attorneys' fees and costs. In fact, section 605(e)(3)(B)(iii) makes such award mandatory, as it states that the court "*shall* direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." See 47 U.S.C. § 605 (e)(3)(B)(iii); Community Television Sys., Inc. v. Caruso, 284 F.3d 430, 434, n.5 (2d Cir. 2000) (noting that section 605 "requires the judge to award reasonable fees."); Int'l Cablevision, Inc. v. Sykes, 75 F.3d 123, 134 (2d Cir. 1996) (remanding case for, inter alia, award of mandatory costs, including attorneys' fees).

In the R&R, however, the Court did not simply review the attorneys' fees requested, and then award those deemed appropriate. Instead, Magistrate Judge Orenstein, who to Cablevision's knowledge had never previously ruled in a default judgment inquest prior to issuing the Martin R&R a week before the present R&R, criticized Cablevision's attorneys' fee arrangements used in Communications Act cases brought by it against its customers. Without holding a hearing or

requesting briefing regarding any of the specific issues the R&R addressed, the Court relied on incorrect assumptions and incomplete data to reach sweeping, but wholly unwarranted conclusions.

The R&R criticizes the flat-fee, or task-billed, arrangement between Cablevision and its counsel for certain tasks, such as preparing a complaint, default judgment motion and damages submissions, arising in its lawsuits against subscribers. R&R at 9. The R&R also disparages and makes incorrect accusations about the motives for the flat-fee arrangement. The R&R states that "The flat fee compensation system that Cablevision and its counsel have created appears to allow the company to obtain legal services in this type of litigation essentially for free and to allow the law firm to make such cases a profit center . . . Such a system works to the great advantage of these two actors because it shifts burdens (including the illusory burden of "drafting" boilerplate papers) to defaulting defendants." Id. at 11-12. The R&R further suggests that Cablevision's counsel's fees are excessive, and possibly in violation of New York State's Disciplinary Rules. Id. at 12. It then observes that "By shifting such fees to absent defendants, Cablevision has no incentive to insist that the law firm charge a reasonable fee for its minimal work in litigating these default cases." Id.

The R&R ultimately concludes by recommending that Cablevision be awarded attorneys' fees (apart from costs) in the total amount of *$0* - for (i) preparing, certifying, filing and arranging for service of a federal court complaint, summons, and civil cover sheet; (ii) moving for a default judgment; and (iii) preparing written default judgment damages submissions that included a detailed, case-specific client affidavit, memorandum of law, and attorneys' fee affidavit. The R&R only approved $319.00 in legal fees for other services performed.

Notably, the R&R, when discussing damages, had cited to numerous reports and recommendations in other cases, id. at 7-8, all of which awarded attorneys' fees to Cablevision

14

consistently with those requested herein, even with respect to the task-billed fees. See e.g., CSC Holdings, Inc. v. O'Donnell, No. CV-03-5865 (DRH)(ARL), DE 8 at 7 (E.D.N.Y. Jan. 27, 2004) (recommending award of $1,256.00 in attorneys' fees), DE 7 (reflecting submissions regarding fixed-fee billing); CSC Holdings, Inc. v. Delvalle, No. CV-03-5870 (TCP)(WDW), DE 10 at 8 (E.D.N.Y. Jul. 21, 2004) (recommending award of $1,319.00 in attorneys' fees), DE 8 (submissions regarding fixed-fee billing); CSC Holdings, Inc. v. Cella, No. CV-04-5690 (DRH)(ARL), DE 6 at 7 (E.D.N.Y. Jan. 30, 2006) (reducing requested fees by just ten percent), DE 6, attachment 3 at 2 (reflecting submissions regarding fixed-fee billing). The R&R fails to distinguish any of these rulings.

## A.  The R&R is Based on Incomplete Data and Incorrect Assumptions, That Lead to Inaccurate Conclusions

As discussed below, the R&R's decision not to allow recovery for task-billed legal services is based primarily upon two incorrect assumptions: First, that Cablevision and its counsel nefariously created a fixed-fee arrangement to reap large profits in default cases; and second, that the fixed-fee arrangement is somehow improper, or results in Cablevision's paying excessive fees. Given its reliance on these incorrect assumptions, the R&R's adoption is unwarranted.

The R&R's conclusion that excessive flat fees in tasks performed in default judgment cases enable Cablevision to reap a profit when damages awards are entered against the defaulting defendants is belied by a number of facts, some of which were perhaps unknown to Magistrate Judge Orenstein. As noted in the Martin M&O at 13, in its Objection, Cablevision submitted additional evidence with respect to these points, in the form of the Louis Aff., submitted by a partner at Cablevision's counsel's firm. Many of these additional points were cited at length in the Martin M&O.

First, Cablevision's counsel charges Cablevision the same flat fee for drafting a complaint in every instance when a complaint is drafted, and Cablevision pays the flat fee in every instance. Louis Aff. ¶ 9. The fee is always charged, and always paid, regardless of whether a case is settled, litigated, dismissed, or results in a default. Id. Indeed, given the length of time between when a given complaint is drafted, filed and served, and the formal deadline for responding, with Cablevision almost universally consenting to defendants' requests for extensions of time to answer, Cablevision's counsel has normally billed for drafting the complaint and may even have been paid by Cablevision prior to anyone knowing whether a given defendant will default or not. Id. Thus, if the price charged for drafting complaints is too high, Cablevision pays it in every case -- not just the minority of cases where defendants default, id. ¶ 6, as the R&R suggests. Given these facts, it is clear that Cablevision does indeed "bear the brunt" of the legal fees its counsel properly charges in every case, and merely attempts to recover those fees paid in accordance with Section 605. See Martin M&O at 13-14 (noting Cablevision's position).

Second, the R&R's analysis about the perceived motives behind the fee arrangements implicitly presumes a very high default rate, in order for what the R&R considers high fixed fees to make financial sense. In reality, however, the default rate is exceedingly low, so low that it would not make sense to tailor (or maintain for five years), a fee agreement based upon the hope that many defendants would default. The present R&R relied upon the Martin R&R which, in turn, had noted that the Court's own review of the public docket revealed that Cablevision had filed 164 similar actions since 2003, but that that only 20 of those cases, including this case, resulted in a notation of default. Id. at 6. Thus, as pointed out in the Martin M&O at 14, using the Court's own data from the Martin case, default judgments occurred in only 12.2% of the cases Cablevision filed. Simply put, it

16

is contrary to common sense to assume, as the R&R does, that Cablevision and its counsel, seeking to maximize revenues for Cablevision, would have structured a billing arrangement that would only benefit Cablevision in 12% of the cases it filed, and that would work to its detriment in the other 88% of cases. See Martin M&O at 14 (noting Cablevision's position).

Third, the R&R incorrectly assumes that default judgments are quickly, easily, and profitably collectible. See R&R at 12 ("By shifting such fees to absent defendants, Cablevision has no incentive to insist that the law firm charge a reasonable fee for its minimal work in litigating these default cases."). In fact, the opposite is normally true. When such judgments are collectible at all, it is usually in the distant future. There are many reasons why defendants in actions brought by Cablevision default, most of which do not bode well for collection prospects. They include a defendant's having moved, having died, being judgment-proof, or consciously avoiding the lawsuit. Louis Aff. ¶ 7. Cablevision's experience regarding the feasibility and ease of collecting upon default judgments is no different from that of most other plaintiffs. Id. Accordingly, any assumption that Cablevision and its counsel would seize upon default judgments as a sure-fire means of enabling Cablevision to obtain free legal services or generating profit is simply untenable. See Martin M&O at 14 (noting Cablevision's position).

Fourth, the R&R further assumes, again incorrectly, that the only tasks for which Cablevision and its counsel have agreed to a task-billing arrangement are the complaint, default judgment motion, and default judgment damages submissions. See R&R at 12 ("Moreover, it seems clear that Cablevision does not bear the brunt of this unreasonable system: **of the three tasks it has agreed to pay for at a flat rate – the complaint, a default motion, and a damages submission – two (billed at a total of $800) are of a type that are only likely to be paid by a defaulting defendant.**")

(emphasis added), <u>cited in</u> Martin M&O at 14.

In reality, when, at Cablevision's request, it and its counsel agreed in 2000 to the task-billing arrangement that encompasses complaints, default motions and default damages submissions, they also agreed to flat fees for other recurring tasks **none of which would ever occur in a typical default judgment case.** Louis Aff. ¶ 11.  These include but are not limited to: (i) drafting mandatory disclosures pursuant to Fed.R.Civ.P. 26; (ii) drafting initial discovery requests such as interrogatories, requests for admission, and document requests, and (iii) drafting settlement documents, and serving copies of settlement documents and related correspondence upon defendants. <u>See</u> Martin M&O at 14-15 (noting Cablevision's position).  The fact that these other tasks are also flat-billed precludes any conclusion that Cablevision and its counsel somehow utilized flat-fee billing solely and specifically to profit from default judgments as the R&R mistakenly accuses. Instead, these facts support the exact opposite, and correct, conclusion that the flat-fee agreement is far broader in scope and intent than simply the three tasks cited by the Court -- two of which would, in any event, only be used in 12% of the cases that Cablevision brought.  Moreover, as a factual matter, Cablevision's counsel's affirmation confirms that the concept of reaping a profit from default judgments was never even conceived of by Cablevision or its counsel, and never played a role in their fixed-fee billing negotiations.  Louis Aff. ¶ 5.  <u>See</u> Martin M&O at 15 (noting Cablevision's position).

**B.    Cablevision's Fixed Fee Arrangements with its Outside Counsel Are Neither Improper, Nor are They Excessive for the Services Performed, Consequently, the R&R's Denial of Recovery For <u>Services Performed Thereunder Was Contrary To Law</u>**

Likewise, the Court's generic suggestion that Cablevision's counsel's fees may be unreasonably high to the point of violating disciplinary rules, R&R at 12, is similarly without merit.

Although counsel's description in its inquest submissions of the services performed for the various fixed fees may be overly succinct, each fixed-billing service encompasses far more than meets the eye. By way of example, the $300.00 charge for "drafting of the complaint," discussed in R&R at 9, includes not only drafting a complaint from a template used for similar actions (something every law firm and likely every judge does in appropriate circumstances) but other not specifically named services that necessarily are performed each time a case is commenced in federal court.

For example, any complaint such as that in this case requires an attorney, reviewing the file and exercising his or her independent professional judgment consistent with Fed.R.Civ.P. 11, to ascertain the factual and legal sufficiency of the claims asserted. This includes a review of the decoder purchase evidence, the customer's cable television subscription history, and records of prior communications by Cablevision, its counsel, or others regarding attempts to contact the defendant to further investigate and attempt to resolve the claims prior to litigation. Such a review often raises questions for discussion with Cablevision prior to proceeding. The review process in a given case not uncommonly results in Cablevision's decision, after consultation with its counsel based on issues its counsel raised, not to bring an action. The fixed "drafting complaint" charge also includes any settlement discussions that Cablevision's counsel has with a defendant during the first 45 days following the filing of a given case, which is not uncommon even in default cases although it did not happen in this case. The "drafting complaint" charge also commonly covers other incidental services, such as drafting other filing-related documents, and for all documents to be copied and forwarded to the Court for filing. Louis Aff. ¶ 13.

Downplaying the reality of everything that must be done to file a federal lawsuit, the R&R characterizes this entire process as "incremental work needed to tailor those papers to the facts of

[the] case [and] not legal work in any sense of the term, and should not be compensated as such," id. at 13. The Supplement goes a step further, seeking to remind the Court that the R&R had noted that "different attorneys at the firm representing Cablevision had at various times claimed authorship of the same boilerplate document and now seek reimbursement for that work." Supp. at 1-2. Cablevision submits that this characterization is inaccurate and unduly harsh. There is no simply no evidence to support a finding that more than one attorney claimed to have authored any specific document. Neither Cablevision nor its counsel claims that every complaint is drafted from scratch by a particular "author." If this were the case, the cost for an attorney to prepare each complaint alone would far exceed $300.00, and would be impossible to justify to a client or court. Nor has Cablevision been billed twice in this case, Martin, or Bokee, for the drafting of a complaint, as the R&R or Supplement might be read to suggest. Instead, as noted in the Louis Aff. ¶ 13, similar to the practice of almost every attorney or judge, Cablevision's counsel does not reinvent the wheel in each case. Similar matters involving different parties are addressed by different documents that are derived from a template. There is nothing improper about this practice, or about charging Cablevision a fixed fee that includes this and other services, particularly when the fee is far less than the cost of individually authoring complaints from scratch.

Cablevision submits that while reasonable minds might differ as to the precise amount that such a fixed fee for the services that culminated in the filing of the complaint should be, the R&R's suggested denial of **all** such fees is flatly contrary to law in that Section 605(e)(3)(B)(iii) requires courts to award reasonable attorneys' fees. By definition, a lawsuit cannot be commenced and litigated solely through the efforts of a paralegal. Instead, attorneys, reviewing all the facts and law and exercising their independent professional judgment, must undertake or supervise all such tasks

related thereto, and when a fee-shifting statute governs, their client should recover reasonable legal fees incurred.

Although the Martin M&O noted that this evidence of the services that underlay the charge for reviewing file and drafting complaint had not been presented to Magistrate Judge Orenstein, id. at 16, it accepted Cablevision's position that the additional evidence submitted adequately supported its request for the $300 fee incurred for reviewing the file and drafting the complaint consistent with the requirements of New York State Ass'n. for Retarded Children, Inc. v. Carey, 711 F.2d 1136 (2d Cir. 1983). Martin M&O at 11. Based on the same evidence submitted herein, Cablevision submits that this Court should do the same herein regarding its request for recovery of fees incurred for reviewing the file and drafting the complaint.

The Martin M&O correctly notes that Cablevision's Objection to the Martin R&R did not provide additional details about the remaining tasks for which recovery was denied, i.e., the default judgment motion and the damages and attorneys' fees inquest submissions, id. at 16, and thus upheld denial of recovery of attorneys' fees for those tasks. Id. at 17. Given the length of its Objection to the Martin R&R, and the Martin R&R's flat denial of all task-billed fees, Cablevision did not provide a detailed discussion of the tasks that underlay each of the flat fees. Instead, it discussed only the fee for reviewing the file and drafting the complaint "by way of example." See Objection in Martin at 15; Affirmation of Wayne Louis in Martin at 5 (copies of relevant pages are attached as Exhibits "E" and "F" to the Louis Aff. herein). The Louis Affirmation herein, however, provides additional details regarding the services underling fees for moving for default judgments ($200 fee) and filing damages and attorneys' fees inquest submissions ($600 fee). Id. ¶¶ 14-15. Cablevision submits that these additional details, which unfortunately were neither before Magistrate Judge

21

Orenstein while he prepared the Martin R&R, nor before District Judge Garaufis in ruling on Cablevision's objection thereto, support an award of the fees requested.

Ultimately, the R&R simply ignores the legal work that unquestionably was done, and the results that were indisputably achieved. Client files do not review themselves, and individualized complaints and other filing documents, default motions, and default judgment damages inquest submissions do not simply draft themselves, proofread themselves, and serve and file themselves. Cablevision should be permitted to recover the reasonable costs for its counsel's having done so. Significantly, other than disputing Cablevision's damages calculations, the R&R does not take issue with the quality of the legal submissions it attacks, or that they accomplished exactly what they were supposed to do, i.e., they enabled Cablevision to commence an action in federal court against the defendant and, when he failed to respond, to obtain a default judgment against him.

While Cablevision's counsel may not have specified in sufficient detail every individual act that the complaint flat fee encompasses, Cablevision submits that its counsel's charging, or its now seeking recovery of $1,606.00 to take the many and varied steps necessary to prepare, review and file a federal court action, prepare letters to process servers and the defendant, obtain a default judgment, and prepare damages and attorneys' fees submissions is more than reasonable, and does not improperly inflate the amount of the judgment against Gorman.

The R&R cites Cablevision Sys. New York City Corp. v. Diaz, 2002 WL 31045855, at *5 (S.D.N.Y. Jul. 10, 2002), which holds that failure to precisely quantify the hours spent on tasks, even if task-billed, warrants denial of an award of such fees. R&R at 9. However, more recent Southern District precedent involving Cablevision is to the contrary. See CSC Holdings, Inc. v. Khrisat, 2005 WL 3030838, at *5 (S.D.N.Y. Nov. 8, 2005) (declining to follow holding in Diaz and recommending

that pre-arranged flat fees be included in award because the contemporaneous records sufficiently detailed the attorney or paralegal who performed the tasks, the date they were performed, and the nature of such tasks, enabling the court to make assessment of lodestar amount). The Martin M&O noted the Khrisat decision, but indicated that it was not inclined to follow it because Cablevision's filing many lawsuits using similar documents, together with the absence of any supporting evidence in the record regarding services performed, led it to believe that the fees requested for these tasks were not reasonable. Martin M&O at 18 ("On the record before me, I cannot conclude that a paralegal would have expended approximately eight hours on these tasks."). Cablevision submits that the more detailed explanation of the services underlying those two tasks, as set forth in the Louis Affirmation ¶¶ 14-15, justify those fees.

Finally, it must be remembered that Cablevision and its counsel freely entered into a fixed-fee arrangement long ago at Cablevision's request to approximate the value of, and achieve some level of uniformity in billing regarding recurring tasks. This is neither nefarious nor unethical, and task-billing is an increasingly popular and appropriate method of providing services. See e.g., McCollam, The Billable Hour: Are Its Days Numbered?, The American Lawyer, November 28, 2005; King, Break the Billable Hour Habit, Law Practice Management, April 2002, at 33. Copies are attached as Exhibits "G" and "H," respectively, to the Louis Aff. Cablevision is a large company with a legal staff that is perfectly capable of selecting any counsel it wishes, determining what rates are appropriate, and negotiating the rates for those services. Apart from its long-standing business relationship with Cablevision, Cablevision's counsel has no affiliation with Cablevision, such as a familial relationship, that conceivably could make transactions between them less than arms-length, or exempt its counsel from competition from other firms. Louis Aff. ¶ 14.

Given the services actually performed for the fixed fees charged to Cablevision, and the arms-length negotiations that occurred between it and its counsel, there is no basis for a conclusion that Cablevision's counsel's fees are at all excessive. Consequently, Cablevision submits that it should be awarded recovery of reasonable attorneys' fees herein for the tasks performed. <u>See</u> <u>Khrisat</u>, 2005 WL 3030838, at *5 (recommending award of flat-billed tasks performed by Cablevision's counsel, and finding that "the pre-arranged flat rates [are] reasonable for the tasks performed.").

## <u>CONCLUSION</u>

Based on the foregoing, Cablevision respectfully requests that the Court decline to adopt the Report and Recommendation, and instead award damages and attorneys' fees consistent with its prior precedents.

Dated: Jericho, New York
April 7, 2006

Respectfully submitted,

LEFKOWITZ, LOUIS, SULLIVAN & HOGAN, L.L.P.

By: _____
Shaun K. Hogan (SH 7227)
350 Jericho Turnpike, Suite 300
Jericho, New York 11753
(516) 942-4700

24